SUGARCREEK TOWNSHIP, Appellee,

v.

CITY OF CENTERVILLE, Appellants, et al.

[Cite as *Sugarcreek Twp. v. Centerville,* 184 Ohio App.3d 480, 2009-Ohio-4794.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 2009–CA–27.

Decided Sept. 11, 2009.

Frost, Brown, Todd, L.L.C., Scott D. Phillips, and Joseph W. Walker, for appellee.

Plank & Brahm, Richard C. Brahm, and Catherine A. Cunningham, for appellant Centerville.

---

Fain, Judge.

{¶ 1} Defendant-appellant, the city of Centerville, appeals from a declaratory judgment of the trial court, which holds that plaintiff-appellee, Sugarcreek Township, is entitled to all real property taxes to be collected from two parcels of land annexed by Centerville. The trial court also held that Centerville violated Sugarcreek's rights under R.C. 709.023(H) by entering into a preannexation agreement to enact a tax-increment financing ("TIF") plan for the annexed parcels.

{¶ 2} Centerville contends that the trial court erred in finding that Sugarcreek has standing to enforce the terms of an agreement to which Sugarcreek is not a party. Centerville further contends that the trial court erred in finding that Sugarcreek's claims present a real case or controversy or are ripe for determination. Finally, Centerville contends that the trial court erred in finding that a municipality may not enact a TIF ordinance in connection with property that has been annexed under the expedited annexation procedure in R.C. 709.023.

{¶ 3} We conclude that the trial court did not err in holding that Sugarcreek has standing to bring a declaratory-judgment action, because Sugarcreek has an interest in having the preannexation agreement construed. Sugarcreek's status is also affected by R.C. 709.023(H), and Sugarcreek is entitled to have the statute construed and to obtain a declaration of its rights under the statute. We further conclude that this controversy is ripe for adjudication because all of the methods Centerville proposed for financing public improvements to the annexation area involve tax abatement on real property that remains in Sugarcreek Township.

{¶ 4} Finally, we conclude that the trial court erred in part in holding that Sugarcreek is entitled to all property tax revenues from the annexed property. The trial court correctly concluded that Centerville cannot interfere with Sugarcreek's collection of real property tax revenue levied on the unimproved and improved value of the real estate that remains in the township. However, the court failed to recognize that Centerville is also entitled to its own share of the minimum levies on the property under R.C. 5709.31 and 5709.315 and can therefore enact TIF legislation to the extent that it does not interfere with Sugarcreek's right to collect its share of the minimum levies on the property under the same statutes.

{¶ 5} Accordingly, the judgment of the trial court is reversed, and this cause is remanded to the trial court for further proceedings consistent with this opinion.

I

{¶ 6} This case arises from a dispute between adjoining jurisdictions over two parcels of commercially valuable land. Centerville won the battle of whether the land was properly annexed to Centerville, but lost the larger war because Sugarcreek retained the right to collect all the real property taxes levied on both parcels of land.

{¶ 7} The land in question belonged to the Charles A. Dille Irrevocable Trust ("Dille Trust"). After Dille's death in August 1999, the trust was fully funded with assets, which included some cash, about 70 acres of land owned by the Dille Trust, and shares of Dille Laboratories Corporation ("Dille Corporation"), which owned about 400 acres of land. A sale of some of the land was desired in order to fund the trust with cash.

{¶ 8} After speaking to various potential purchasers, Dille Corporation and the Dille Trust entered into a purchase agreement with Bear Creek Capital, L.L.C. ("Bear Creek") in September 2004. The purchase agreement covered approximately 157 acres on the west side of Interstate 675 and about 73 acres on the east side of Interstate 675 (referred to respectively as the "northern parcel" and the "southern parcel"). Both parcels were located in Sugarcreek Township and were considered to have valuable development potential. Bear Creek had previously developed commercial property in Sugarcreek and intended to develop a large-scale, multiuse, commercial project on the parcels.

{¶ 9} During 2004, Bear Creek worked with the Sugarcreek Township trustees on development, which would require zoning changes. In February 2005, Bear Creek brought up the possibility of annexation to the adjacent cities of Kettering or Centerville, in the event that Sugarcreek failed to immediately move on the zoning changes. Sugarcreek passed zoning at that time, but negotiations between Sugarcreek and Bear Creek subsequently broke down, due to zoning issues and a merger study that had been placed on the ballot for Sugarcreek Township and the city of Bellbrook. If the merger study passed, annexation to other jurisdictions would be precluded while the merger was being studied.

{¶ 10} The proposal for a merger study was defeated in November 2005, and Bear Creek then discussed annexation with Kettering officials in December 2005. Bear Creek also began discussing annexation with Centerville officials around the same time. In January 2006, Centerville's city manager told the Centerville city council that he hoped to have an annexation agreement approved by the city and Bear Creek within the next few weeks.

{¶ 11} In February 2006, officials of Kettering, Centerville, and Sugarcreek met to discuss a plan for how the Dille property would be developed, since the development would affect all three jurisdictions. There is some conflict over what occurred at this meeting. According to Sugarcreek, the parties believed that Bear Creek was shopping its plan with other jurisdictions to get the best economic plan and concluded that forming a joint economic agreement might be in the best interests of Centerville, Sugarcreek, and Kettering. Sugarcreek left the meeting with the impression that none of the communities would go it alone. In contrast, Centerville maintains that its clearly stated position was that it was open to pursuing joint projects but that it was also open to annexation if that was the developer's preference.

{¶ 12} On April 3, 2006, Centerville city council held a special meeting to consider passing resolutions authorizing City Manager Greg Horn to enter into a preannexation agreement with Bear Creek, Dille Corporation, and the Dille Trust regarding the property. Sugarcreek representatives who had been present at the meeting in February 2006 spoke before the Centerville city council and stated that they were shocked and stunned by the annexation news. Nonetheless, city council passed resolutions authorizing Horn to enter into the preannexation agreements, which were later signed by Horn and the other parties on April 5, 2006.

{¶ 13} Three preannexation agreements, with virtually identical terms, were signed in April 2006. For purposes of brevity, we will refer to the preannexation agreement for the 157–acre parcel, which was signed by Horn, Dille Corporation as the "Owner," and Bear Creek as the "Developer." The agreement provides as follows:

{¶ 14} "1. Annexation

{¶ 15} "(a) The Developer agrees that it will obtain the signature of the Owner and will, at its own expense, prepare and file the necessary annexation petition or petitions with accompanying map or plat with the appropriate board of county commissioners. The Owner agrees that it will sign the annexation petition and will support and not withdraw its name during the annexation process and/or any subsequent administrative or legal action involving pursuit of the annexation. The annexation petition shall be filed as an 'Expedited Type 2' annexation as provided in Section 709.023 of the Ohio Revised Code. * * * The City agrees to pass a service resolution and/or any necessary supporting resolutions as required by Section 709.023(C) of the Ohio Revised Code within twenty (20) days of the date of the filing of the annexation petition with the appropriate board of county commissioners. A service resolution will set out those services that will be provided by the City upon annexation and will establish the approximate date when those services will be available.

{¶ 16} "(b) The Owner, Developer, and the City agree to cooperate and provide information necessary for the county commissioners to make their 'review' of the annexation as required by Section 709.023 of the Ohio Revised Code. If, at the conclusion of the review process the county commissioners deny the annexation petition, the Owner agrees to file in the appropriate court a request for a writ of mandamus to compel the county commissioners to approve the annexation as set out in Section 709.023 of the Ohio Revised Code. * * *

{¶ 17} "(c) Should the annexation be approved, the Owner, Developer, and the City agree to process the annexation as provided by law subject to the terms of this agreement."

{¶ 18} The preannexation agreement contains further provisions on zoning, platting, and water, sewer, and public utilities. In Section 5, the agreement provides as follows with regard to financing improvements:

{¶ 19} "The parties recognize that significant improvements may be needed to service the proposed development of the Property in the City, and, accordingly, the parties agree to undertake or participate in the following financing arrangements or mechanisms:

{¶ 20} "(a) Coincident with the City's approving the final plans for development of any portion of the Property that has been annexed to the City, the City shall as soon as practical take steps to present to the City Council legislation to create the Tax Increment Financing (the 'TIF Ordinance') to enable the City to collect up to the maximum amount of payments in lieu of taxes which may be generated from the new development without approval from a school district. The payments made in lieu of taxes will be applied by the City to recoup and apply to the costs associated with the construction of the necessary public improvements. Pursuant to the TIF Ordinance, the City and Developer shall enter into a public infrastructure agreement ('the Infrastructure Agreement') pursuant to which the City and Developer agree to erect, construct and maintain Public Improvements on the Property or which, in the opinion of the City, benefit or serve the Property or which have been deemed reasonably necessary by the City and the Developer. The TIF Ordinance shall also specify the use of service payments as provided in ORC Section 5709.42.

{¶ 21} "(b) The Developer and City shall enter into a service payment agreement reasonably acceptable to Developer and the City (the 'Service Agreement') setting forth the duties and obligations of a Tax Increment Financing District that does not involve the deprivation of any school district moneys.

{¶ 22} "(c) Upon request of the Developers, the City agrees that it will take such action as is necessary to issue Tax Increment Financing Bonds (the 'Bonds') in order to pay the costs of the Public Improvements to be constructed on the

Property and that the debt service on the Bonds will be paid solely from Service Payments (which means the Statutory Service Payments and any supplemental payments (the 'Minimum Service Payments') as may be required by a Service Agreement. The Public Improvements to be covered by Tax Increment Financing shall include, but not be limited to, the installation of roads, utility lines, sidewalks, and other public infrastructure improvements deemed reasonably necessary by the Developer and the City." (Unmatched parentheses sic.)

{¶ 23} The preannexation agreement also contains various representations, including "This Agreement is the valid and binding act of the City, enforceable against the City in accordance with its terms." Section 6(c). Finally, the agreement states that any waiver of the terms of the agreement must be made in writing, and that "[t]he representations, warranties and covenants contained in this Agreement shall not terminate for a period of twenty (20) years."

{¶ 24} A tax-increment financing plan ("TIF plan") is a method of financing that is used to pay for public improvements. A public entity will sell bonds for public improvements and recoup the money from the increase in value of property that is enhanced by the public improvements. The property owners make service payments to a fund in lieu of property taxes, and the public entity pays the bond obligations with the money in this fund, rather than with the public entity's general revenue fund.

{¶ 25} In late May 2006, annexation petitions were filed with the Greene County Board of Commissioners, seeking annexation of the northern and southern parcels to Centerville. On April 20, 2006, before the annexation petitions were filed, Sugarcreek adopted a TIF plan that encompassed some of the annexed lands, among others. The TIF funds were to be used to extend Clyo Road in Sugarcreek Township and for other infrastructure improvements in the area. The Clyo Road project had been planned for about 12 years and was needed for safety purposes so that citizens could be served by the Safety Building and fire station located on Clyo Road. At the time, Clyo Road dead-ended without a connection to other parts of Sugarcreek township.

{¶ 26} Sugarcreek had $300,000 in a bridge fund and had also previously received a $500,000 public-works grant for the Clyo Road project. In addition, Sugarcreek had acquired most of the right of way and had obtained a $1,500,000 TIF-anticipation loan. Sugarcreek decided to create a TIF in April 2006, due to the potential loss of the public-works funding. The Clyo Road project was also a high priority for the township.

{¶ 27} The Sugarcreek TIF resolution lists certain public improvements that are to be made in the TIF district, including the Clyo Road extension and other improvements necessary for development of the parcels in the TIF district. The

resolution further provides for service payments in lieu of taxes for owners who make private improvements in the TIF district after the date of the resolution. Seventy-five percent of the assessed value of the improvements is exempted from real property taxation, and the owners are to make semiannual service payments to the Greene County treasurer. The service payments, in turn, are to be deposited into a tax-increment-equivalent fund, which is to be used to pay the cost of the public improvements in the TIF district. The service payments are scheduled to last ten years, or until the public improvements are paid in full from the fund, but in no case for more than ten years. Sugarcreek Township Resolution No. 2006–04–20–01.

{¶ 28} In late June and early July 2006, Greene County granted the annexation petitions for the northern and southern parcels, respectively. Centerville then accepted the annexation of the parcels in October 2006. Before Centerville accepted the annexations, Sugarcreek filed an action for declaratory judgment in the Greene County Common Pleas Court. Sugarcreek sought a declaration that Centerville could not establish a TIF plan for the land it intended to annex. Subsequently, Sugarcreek filed an amended complaint, alleging that Centerville's resolutions accepting the annexed land were defective and per se invalid. Sugarcreek also alleged that the resolutions violated Centerville's charter and Ohio Sunshine Laws.

{¶ 29} Centerville filed a motion and supplemental motions for summary judgment. In its original motion, Centerville contended that no case or controversy existed, because Centerville had not passed a TIF ordinance. Centerville also alleged that the preannexation agreement had been amended by a October 2006 memorandum of understanding ("MOA") that expanded the types of financing options that could be used to finance future public improvements. In a supplemental motion, Centerville contended that Sugarcreek lacked standing to contest the annexation because Sugarcreek had failed to avail itself of statutory remedies under the annexation statutes.

{¶ 30} Sugarcreek also filed a motion for partial summary judgment with regard to Centerville's ability to implement a TIF ordinance. In the motion, Sugarcreek contended that it was entitled to retain the property taxes on the annexed property pursuant to R.C. 709.023(H).

{¶ 31} In November 2007, the case was removed from the trial court's active docket because Sugarcreek and Centerville had executed a memorandum of understanding regarding possible settlement of the case. Sugarcreek subsequently moved the court to reactivate the case in April 2008 because the parties had not been able to finalize an agreement. Mistakenly believing the case had been settled, the trial court dismissed the case with prejudice. The court then

granted Sugarcreek's motion for relief from judgment in September 2008 and vacated the dismissal.

{¶ 32} After the case was reinstated, Centerville filed another supplemental motion for summary judgment, claiming that Sugarcreek had entered into an agreement for construction and funding of the Clyo Road extension and had admitted in the signed documents that the property had been annexed and was located in Centerville. In response, Sugarcreek noted that Centerville had taken affirmative steps to implement a TIF and had, in fact, introduced TIF legislation related to the Dille property in its city council proceedings in January 2008.[1]

{¶ 33} In January 2009, a magistrate held a summary-judgment hearing and heard oral argument but no evidence. The magistrate then filed a decision, concluding that Sugarcreek's failure to object to the petition for annexation of the northern parcel constituted consent to the annexation under R.C. 709.023(D). The magistrate further held that Sugarcreek's objection to the petition for annexation of the southern parcel was not specific and failed to meet the conditions specified in R.C. 709.023(E)(1). In addition, the magistrate found that judicial appeal of a municipality's acceptance of annexation is outside the scope of an appeal filed under R.C. 709.023.

{¶ 34} Regarding the TIF claims, the magistrate held that Sugarcreek had standing to seek a declaratory judgment as to its right to real property taxes for the annexed property. The magistrate also concluded that there was no evidence that the parties had executed an amendment to the preannexation agreement, incorporating the changes in the October 2006 MOA, or that the MOA had nullified the commitment in the preannexation agreement for the city to present legislation creating TIF financing. The magistrate held that this financing would violate R.C. 709.023(H) by diverting real estate taxes from Sugarcreek to Centerville. Centerville, therefore, could not divert real estate property taxes for the annexed property from Sugarcreek to Centerville, either by service payments in lieu of taxes or otherwise. The magistrate, therefore, granted the motion for summary judgment of Centerville, Dille Corporation, and the Dille Trust on the issue of annexation and granted Sugarcreek's motion with respect to the TIF issue.[2] Both sides filed objections to the magistrate's decision.

{¶ 35} The trial court, in a judgment entry filed in March 2009, adopted the magistrate's decision. The trial court concluded that Sugarcreek had standing because Centerville did not commit to an abandonment of TIF financing in the

---

1. A motion to table the TIF resolution was passed on January 28, 2008. See minutes of Centerville city council meeting for January 28, 2008.

2. Dille Corporation and the Dille Trust had been added as parties to the litigation in July 2007 and had joined in Centerville's summary-judgment motions.

October 2006 MOA. The court further held that enacting a TIF plan in the annexed territory would violate R.C. 709.023(H). The trial court also concluded that the property had been properly annexed.

{¶ 36} Centerville appeals from the summary judgment of the trial court rendered in favor of Sugarcreek on the issue of the enactment of a TIF. Sugarcreek has not appealed the summary judgment rendered in favor of Centerville on the issue of the annexation itself.

## II

{¶ 37} Centerville's first assignment of error is as follows:

{¶ 38} "The trial court erred in finding that Sugarcreek Township had standing to enforce the terms of a contract it was not a party to and that the contracting parties themselves agreed and intended not to enforce certain provisions."

{¶ 39} Under this assignment of error, Centerville contends that the trial court erred in concluding that Sugarcreek has standing to bring this action. Centerville argues that Sugarcreek is not a party to the preannexation agreement and has no right to enforce its terms. In addition, Centerville contends that the parties to the agreement waived enforcement of the TIF requirement when they entered into the October 2006 MOA.

{¶ 40} Our review of a summary judgment is "de novo, which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 133, 2007-Ohio-2722, 873 N.E.2d 345, at ¶ 16. The standard used by trial courts is that summary judgment under Civ.R. 56 may be granted "if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." *Smith v. Five Rivers MetroParks* (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422.

{¶ 41} The parties in the case before us do not dispute the material facts, although they do dispute the meaning of some of the facts as they apply to the issue of standing. For example, Centerville contends that the MOA removed any obligation to enact TIF legislation. Conversely, Sugarcreek contends that the MOA does nothing to modify or rescind Centerville's agreement that it shall present TIF legislation. Sugarcreek also contends that there is no evidence that Centerville ever amended the preannexation agreement.

{¶ 42} The issue of standing "is a threshold question for the court to decide in order for it to proceed to adjudicate the action." *State ex rel. Jones v. Suster* (1998), 84 Ohio St.3d 70, 77, 701 N.E.2d 1002. The issue of "[l]ack of

standing challenges the capacity of a party to bring an action, not the subject matter jurisdiction of the court." Id. To decide whether the requirement has been satisfied that an action be brought by the real party in interest, "courts must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief." *Shealy v. Campbell* (1985), 20 Ohio St.3d 23, 25, 20 OBR 210, 485 N.E.2d 701.

{¶ 43} Sugarcreek contends that it has standing under the declaratory-judgment provision in R.C. 2721.03, which states:

{¶ 44} "[A]ny person interested under a deed, will, written contract, or other writing constituting a contract or any person whose rights, status, or other legal relations are affected by a constitutional provision, statute, rule as defined in section 119.01 of the Revised Code, municipal ordinance, township resolution, contract, or franchise may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it."

{¶ 45} "A grant of declaratory judgment is proper when (1) a real controversy exists between adverse parties, (2) the controversy is justiciable, and (3) speedy relief is needed to preserve rights that otherwise may be impaired." *Clark Cty. Solid Waste Mgt. Dist. v. Danis Clarkco Landfill Co.* (1996), 109 Ohio App.3d 19, 40, 671 N.E.2d 1034, citing *Fairview Gen. Hosp. v. Fletcher* (1992), 63 Ohio St.3d 146, 148–149, 586 N.E.2d 80.

{¶ 46} After reviewing the record, we conclude that Sugarcreek has standing to bring this action on two grounds. First, Sugarcreek has an interest in having the preannexation agreement construed. Second, Sugarcreek's status is affected by R.C. 709.023(H), and Sugarcreek is entitled to have the statute construed and to obtain a declaration of its rights under the statute.

{¶ 47} In *Canton v. Imperial Bowling Lanes, Inc.* (1968), 16 Ohio St.2d 47, 45 O.O.2d 327, 242 N.E.2d 566, the Supreme Court of Ohio held that a city had standing under R.C. 2721.03 to bring a declaratory-judgment action to determine whether a liquor permit holder could sell intoxicating liquor in a part of a dry township that had been annexed to the city, which was wet. Id. at 48–51, 45 O.O.2d 327, 242 N.E.2d 566. The court held that a justiciable controversy existed, because the city's legal relations, as enforcer of the law, were affected by various statutes involved in the question of whether sales of liquor in the annexed territory were now lawful. Id. at 51, 45 O.O.2d 327, 242 N.E.2d 566.

{¶ 48} Similarly, in *Silver Lake v. Metro Transit Auth.*, Summit App. No. 22199, 2005-Ohio-2157, 2005 WL 1026552, a village brought a declaratory-judgment action, attempting to obtain a declaration that a regional transit authority

had no statutory authority to operate a dinner excursion train on a secondary railroad line that ran along the village's border. Id. at ¶ 2. On appeal, the village contended that it had standing because it was interested in the contract between the transit authority and a third party and because its rights were affected by statutory authority addressing the power and authority of the transit authority. Id. at ¶ 20. The village also claimed injury based on violation of its zoning code and an alleged decrease in property values of homes affected by operation of the excursion train. Id.

{¶ 49} The Ninth District Court of Appeals concluded that the village did not have standing to seek a declaration that the proposed commercial use of the railway line was improper, because the village had never zoned the area where the line was located. Id. at ¶ 21. The court did find, however, that the village had standing because of the potential decrease in property values if the transit authority pursued operation of the excursion train in excess of its statutory authority to do so. Id. at ¶ 22.

{¶ 50} Likewise, in *Sylvania Twp. Bd. of Trustees v. Lucas Cty. Bd. of Commrs.*, Lucas App. No. L–01–1447, 2002-Ohio-3815, 2002 WL 1729895, the Sixth District Court of Appeals found that a township had standing to challenge annexation covenants signed by property owners in the township, as well as a prior sewerage agreement signed by the city of Sylvania and Lucas Township. The Sixth District concluded that a "real controversy" existed because the area over which the township had jurisdiction would be reduced if annexation were allowed to proceed. Id. at ¶ 5 and 18–19.

{¶ 51} In the case before us, Sugarcreek contends that it is entitled to all property tax revenues from the annexed properties, pursuant to R.C. 709.023(H). Centerville conversely claims that R.C. 709.023(H) cannot be construed in the manner that Sugarcreek contends. Centerville contends that it is statutorily entitled to both collect and exempt property tax revenues in the annexed area. A real controversy exists as to the construction of R.C. 709.023(H), as well as other statutes raised by Centerville, and Sugarcreek will suffer an injury if it is deprived of property taxes from the annexed areas. Therefore, Sugarcreek has standing to pursue this matter.

{¶ 52} Sugarcreek also has an interest in the construction of the preannexation agreement, and a justiciable controversy exists in that regard. Under Section 1(c) of the agreement, if the annexation is approved, Centerville must process the annexation "as provided by law subject to the terms of this agreement." Section 5 of the agreement further requires Centerville to present legislation to create a TIF ordinance to allow the city to collect the allowable maximum of payments in lieu of taxes from the new development. Finally, the agreement provided that its

warranties, representations, and covenants "shall not terminate for a period of twenty (20) years." Section 19.

{¶ 53} Centerville claims that the preannexation agreement was amended by an October 6, 2006 MOA. In this document, Centerville, Dille Corporation, the Dille Trust, and Bear Creek agreed to allow the MOA to "serve as an agreement to enter into an Amendment to the Pre–Annexation Agreement." Paragraph 5 of the MOA states:

{¶ 54} "The parties agree to provide or review alternative financing options for the public road improvements in addition to TIF financing, including consideration of special assessments. The agreement will add a paragraph (d) that states 'That the City and developer may set up or utilize special assessment financing to guarantee service payments in accordance with the utilization of the TIF or, as an alternative or supplement to the TIF or will provide traditional CRA financing.'"

{¶ 55} The magistrate and trial court noted that this agreement does not either nullify or rescind the commitment to present TIF legislation to city council or to implement a TIF plan for the annexed territory. We agree, for several reasons.

{¶ 56} In the first place, Centerville failed to submit evidence that the city manager was authorized to sign the MOA. The testimony of both Centerville's economic development director and a city council member, James Singer, indicates that council passed three resolutions during a public meeting, authorizing the city manager to enter into the preannexation agreement in April 2006. These resolutions have not been made part of the record, and there is also no indication that the resolutions authorized the city manager to enter into future agreements, following the preannexation agreements that were signed in April 2006.

{¶ 57} Furthermore, there is neither testimony nor evidence of record indicating that resolutions were passed by city council during a public meeting, authorizing the city manager to enter into the October 2006 MOA. The October 2006 MOA is attached as Exhibit 77 to the deposition of City Manager Greg Horn. Horn indicated in his deposition that he had signed the MOA. However, he never stated that council had authorized him to sign the agreement, nor did he say that council had passed a resolution authorizing him to enter into the MOA.[3]

---

3. By our discussion, we are not concluding that city council did not authorize its manager to enter into the MOA; there is simply no evidence of that fact in the record. Compare Exhibit E attached to Sugarcreek's motion to reactivate, which was filed on April 4, 2008. Exhibit E is a copy of Resolution No. 52–09, which was enacted by the Centerville city council on November 5, 2007. This resolution authorized the city manager to enter into a memorandum of understanding with Sugarcreek Township regarding the Dille property, in order to settle the lawsuit between the parties. It is possible that a similar resolution was enacted, giving the city manager the ability to enter into the October 2006 MOA, but no resolution matching this description is part of the trial court record.

{¶ 58} Furthermore, even if Horn had been given authority to enter into the October 2006 MOA, there is no evidence that the parties followed through by amending the preannexation agreement. And as noted by the trial court, the MOA did not rescind the requirement of introducing TIF legislation.

{¶ 59} More important, however, is the fact that the alternatives listed in the October 2006 MOA—special assessments and CRA financing—both involve tax abatement or exemption and would affect Sugarcreek's tax revenues in the annexation area.

{¶ 60} Horn testified in his deposition that a "special assessment financing to guarantee service payments" is "similar to what we did with the Yankee Trace development where the owner petitioned for special assessment financing, and we were able to do that through a tax exempt structure and spread it out over several years to help assist with financing of public improvements." Horn indicated that special assessments are included on the property tax bill as a "special item."[4]

{¶ 61} Horn also testified that a "traditional CRA" is a "community reinvestment area." Regarding how a community reinvestment area works, the following exchange occurred during Horn's deposition:

{¶ 62} "A. That is a method under Ohio law that allows for abatement of taxes.

{¶ 63} "Q. So it becomes, basically a – it forgives taxes that are otherwise due, or what?

{¶ 64} "A. I guess 'forgives' would be acceptable terminology. It is, again, an abatement.

{¶ 65} "Q. How would that work on a project like this one?

{¶ 66} "A. It would provide an alternative revenue source for public infrastructure.

---

4. Under R.C. Chapter 727, municipalities have the power to levy and collect special assessments for the costs of improvements that specially benefit property. See, e.g., R.C. 727.01. Special assessments are typically considered to be different from general taxes because they cannot be levied on property without notice to the owner and cannot exceed the special benefit. *Hammond v. Winder* (1919), 100 Ohio St. 433, 444–445, 126 N.E. 409. " 'A special assessment is not a tax as such. It is an assessment against real property based on the proposition that, due to a public improvement of some nature, such real property has received a benefit.' " *Cleveland Clinic Found. v. Wilkins,* 103 Ohio St.3d 382, 2004-Ohio-5468, 816 N.E.2d 224, at ¶ 12, quoting *State v. Carney* (1956), 166 Ohio St. 81, 83, 1 O.O.2d 210, 139 N.E.2d 339. This distinction does not exist in the present situation, however, because Horn stated that the property tax would be abated in exchange for the "special assessment." If Centerville cannot directly enact a TIF ordinance that would interfere with Sugarcreek's collection of property tax, it cannot do so indirectly, by means of an ordinance authorizing a "special assessment" that would be paid in exchange for tax abatement.

{¶ 67} "Q.  * * * Can you maybe explain that a little bit more?

{¶ 68} "A.   It is an incentive to a developer to allow them to be in a position to financially take on major infrastructure costs.

{¶ 69} "Q.   So instead of the city floating bonds for the infrastructure work to be done, the developer pays for those improvements himself and then, in exchange for that, gets an abatement on the property—on a portion of the property taxes?

{¶ 70} "A.   It could be done that way.   It doesn't necessarily mean that the city wouldn't float bonds.   It could be a supplement or in conjunction with."

{¶ 71} Accordingly, even if the preannexation agreement had been modified by the October 2006 MOA, Sugarcreek's ability to collect property tax revenues in the annexation areas would have been affected.   Any property tax exempted by Centerville would affect Sugarcreek, because Sugarcreek contends that it is entitled to all the property tax revenue in the annexation area.

{¶ 72} Based on the preceding discussion, we conclude that Sugarcreek had standing on two separate grounds to maintain a declaratory-judgment action under R.C. 2721.03.   Centerville's first assignment of error is overruled.

III

{¶ 73} Centerville's second assignment of error is as follows:

{¶ 74} "The trial court erred in finding tax increment financing (TIF) claims made by Sugarcreek Township either presented a real case in controversy or were ripe for determination.   (Judgment entry p. 6; magistrate's decision p. 71)."

{¶ 75} Under this assignment of error, Centerville contends that this matter is not ripe and that no real case or controversy exists because Centerville has not yet enacted TIF legislation.   The trial court concluded otherwise, finding that Centerville had already violated R.C. 709.023(H) by contracting to enact TIF legislation.

{¶ 76} The Supreme Court of Ohio has indicated:

{¶ 77} "The ripeness doctrine is motivated in part by the desire 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies * * *.'  *Abbott Laboratories v. Gardner* (1967), 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691. As one writer has observed:

{¶ 78} " 'The basic principle of ripeness may be derived from the conclusion that "judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote."  * * * [T]he prerequisite of ripeness is a limitation on

jurisdiction that is nevertheless basically optimistic as regards the prospects of a day in court: the time for judicial relief is simply not yet arrived, even though the alleged action of the defendant foretells legal injury to the plaintiff.' Comment, Mootness and Ripeness: The Postman Always Rings Twice (1965), 65 Colum. L.Rev. 867, 876 [quoting Kenneth Culp Davis, Ripeness of Governmental Action for Judicial Review (1955), 68 Harvard L.Rev. 1122]." *State ex rel. Elyria Foundry Co. v. Indus. Comm.* (1998), 82 Ohio St.3d 88, 89, 694 N.E.2d 459.

{¶ 79} For the reasons stated above, this assignment of error is without merit. Any of the alternative methods for financing improvements specified in the agreements between Centerville and Bear Creek would impair Sugarcreek's ability to collect property taxes in the annexation area. Accordingly, the dispute is not hypothetical or abstract but presents a real case or controversy between the parties.

{¶ 80} Moreover, according to Centerville's evidence, Sugarcreek has entered into agreements for the construction and funding of Clyo Road and has therefore incurred expense that must be repaid by properties in the annexation area, pursuant to Sugarcreek's TIF resolution. That resolution accounts for the maximum permissible amount (75 percent of the assessed value of improvements in the annexation area) that can be taken without approval of the local school districts. See R.C. 5709.73. The required TIF resolution in the preannexation agreement covers the same amount and would conflict with Sugarcreek's ability to collect property tax. Accordingly, for the reasons stated, the present controversy is neither hypothetical nor abstract.

{¶ 81} Centerville's second assignment of error is overruled.

## IV

{¶ 82} Centerville's third assignment of error is as follows:

{¶ 83} "The trial court erred in finding that a municipality may not utilize tax increment financing on property that has been annexed utilizing the R.C. 709.23 expedited (type 2) annexation process. (Judgment entry p. 6, 7, 8 and 12; magistrate's decision p. 70–71)."

{¶ 84} Under this assignment of error, Centerville contends that the trial court erred in concluding that property annexed under a type–2 annexation can never be exempted from real property taxation in connection with municipal tax-increment financing. Centerville contends that R.C. 709.023(H) is clear on its face and simply provides that municipalities may not conform a township's boundaries to those of the municipality after annexation. For purposes of argument, Centerville further contends that even if R.C. 709.023(H) is ambiguous, it does not alter the real property tax consequences or economic-development

incentives prescribed by Ohio law. Sugarcreek argues in response that R.C. 709.023(H) unambiguously provides that townships retain the right to property tax revenues following annexation and that Centerville's commitment to adopt a TIF plan violates the statute.

{¶ 85} In order to fully address these points, we will first consider general principles relating to property taxation and annexation and will then discuss the statutes involved in this case.

### A. General Principles of Property Taxation

{¶ 86} All real property in Ohio is subject to taxation, except as expressly exempted. R.C. 5709.01(A). Real property is taxed in the district and county in which it is located. Each county is the unit for assessing real estate, and the county auditor assesses all real estate situated in the county. R.C. 5713.01.

{¶ 87} Real estate is assessed and taxed based on its "true value," which is the fair market value or current market value. The value of property is determined by the county auditor, and the assessed value of real property is 35 percent of its true value. R.C. 5713.03; Ohio Adm.Code 5703–25–05(B). Under R.C. 5705.03(B)(1), if a subdivision is located in more than one county, the county auditor obtains current tax valuations for the portion of the subdivision located in the other county.

{¶ 88} Constitutionally, no real property may be taxed in excess of one percent of its true value in money for all state and local purposes, except that a majority of electors in a taxing district may pass additional taxes outside this limit and that additional taxes may be provided for by the charter of a municipal corporation. Section 2, Article XII of the Ohio Constitution.

{¶ 89} Under R.C. 5705.02, the aggregate amount of taxes that may be levied on any taxable property in any subdivision or other taxing authority (which includes townships and municipalities) is ten mills on each dollar of tax valuation of the subdivision, except for taxes specifically authorized to be levied in excess thereof.

{¶ 90} R.C. 5705.03 authorizes taxing authorities to levy taxes annually on real and personal property within the subdivision for the purpose of paying the current operating expenses of the subdivision and acquiring or constructing permanent improvements. This section also provides a procedure for submitting taxes outside the ten-mill limit to the electorate. Special levies within the ten-mill limit are allowed for construction and repair of roads, for libraries, and for some other purposes, without a vote of the people. R.C. 5705.06. Levies in excess of the ten-mill limit are authorized by vote of the people. R.C. 5705.07. And R.C. 5705.19 lists purposes for which taxes can be levied in excess of ten mills, upon approval of a majority of the electorate.

{¶ 91} All revenue derived from the general levy for current expenses within the ten-mill limit, for any general levy for expense authorized in excess of the ten-mill limit, and from sources other than the general property tax are paid into the general fund. R.C. 5705.10. Townships, like municipalities, are taxing authorities. R.C. 5705.01(A) and (C). Townships also have authority to tax coextensively with their borders. See, e.g., R.C. 5705.03 and *Roderer v. Miami Twp. Bd. of Trustees* (1983), 14 Ohio App.3d 155, 158, 470 N.E.2d 183. Municipalities have the same power to tax within their boundaries.

### B. General Principles of Annexation

{¶ 92} Annexation is governed by R.C. Chapter 709. R.C. 709.02 to 709.11 governs petitions for annexation by a majority of owners of real estate that is contiguous to a municipal corporation. Prior to the enactment of Am.Sub.S.B. No. 5, 149 Ohio Laws, Part I, 621 ("Senate Bill 5") in 2001, the requirement was that the land be "adjacent."

{¶ 93} Before Senate Bill 5 was enacted in 2001, there were no special procedures for annexation occurring with the consent of 100 percent of the property owners in the area to be annexed—the law simply indicated that a majority of owners of adjacent real estate could petition the board of county commissioners to be annexed. A public hearing then had to be held, after which the board could grant the petition if it found, among other things, that the annexed area was not unreasonably large and that the general good of the territory would be served by the annexation. This gave the board some discretion over annexation. Former R.C. 709.02 (1979) and 709.033 (1989); and *In re Annexation of 118.7 Acres in Miami Twp. to Moraine* (1990), 52 Ohio St.3d 124, 131–132, 556 N.E.2d 1140.

{¶ 94} Senate Bill 5 retained this procedure. Currently, in majority-owner petitions, the board of commissioners must still decide that the proposed area is "not unreasonably large" and that, on balance, the general good of the territory proposed to be annexed will be served. R.C. 709.033(A). Therefore, the board still has some discretion with regard to majority-owner annexations.

{¶ 95} After an annexation is approved by the board and is accepted by the municipality, the annexed territory is a part of the municipal corporation and the inhabitants have the rights and privileges of inhabitants of, and are subject to the power of, the municipality. R.C. 709.10.

{¶ 96} Prior to the enactment of Senate Bill 5, another method of annexation existed. Municipal corporations could petition to annex contiguous property owned only by the municipal corporation, a county, or the state. These proce-

dures have analogs in the law after Senate Bill 5 and are not particularly relevant. See R.C. 709.13 to 709.16.

{¶ 97} The legislature enacted Senate Bill 5 in 2001 and substantially altered existing annexation statutes. The new annexation statutes add three special procedures for expedited annexation. These procedures eliminate discretion by requiring the board of commissioners to approve annexation if the petition complies with certain technical requirements.

{¶ 98} The annexation involved in the present case is the second of the three new annexation procedures and is referred to as an "expedited type–2 annexation." *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Commrs.*, 112 Ohio St.3d 262, 264, 2006-Ohio-6411, 858 N.E.2d 1193, at ¶ 7. The statute pertaining to this type of procedure is R.C. 709.023 and is not analogous to any statutes existing prior to 2001.

{¶ 99} R.C. 709.023 is used when the land annexed is not to be excluded from the township under R.C. 503.07. R.C. 503.07 existed prior to the enactment of Senate Bill 5 and allows municipalities to petition the county commissioners to change township lines, so that the boundary lines are identical, in whole or in part, with the limits of the municipal corporation.

{¶ 100} Prior to the passage of R.C. 503.07 in 1961, there were two methods of changing township boundaries – by petition of township residents and by a city's petition. *State ex rel. Dublin v. Delaware Cty. Bd. of Commrs.* (1991), 62 Ohio St.3d 55, 58, 577 N.E.2d 1088. Granting the petition of a city or township residents was originally discretionary with the board of county commissioners. In 1961, granting a city's petition was made mandatory, pursuant to R.C. 503.07. However, the commissioners still retained discretion over the petitions of township residents. Id.

{¶ 101} The Ohio Supreme Court held in *State ex rel. Dublin*:

{¶ 102} "Pursuant to R.C. 503.07, a board of county commissioners must comply with a municipal petition for a change of township boundaries in order to make those boundaries conform, in whole or in part, to the limits of the municipality." Id. at syllabus.

{¶ 103} *State ex rel. Dublin* involved the city of Dublin, whose boundaries included land in three counties and four townships, and none of the townships was wholly located in the city. Id. at 56, 577 N.E.2d 1088. The city wanted the borders of the largest township enlarged to encompass the parts of the other townships that were within city boundaries. The Supreme Court of Ohio held that the commissioners had no discretion—that they were required to change the township boundaries upon the city's application, due to the changes in the statute (R.C. 503.07) that governs municipal requests to conform boundaries. The

Supreme Court of Ohio also held that the boundaries of a township can extend into an adjoining county. Id. at 60–61, 577 N.E.2d 1088.

{¶ 104} The relevance of this is that if the annexation in the present case were not a type-2 annexation, Centerville could have petitioned the Greene County Board of Commissioners, under R.C. 503.07, to conform the boundaries of the annexed property in Sugarcreek Township to those of Centerville.

{¶ 105} In situations in which a municipality chooses not to petition the commissioners to conform the boundaries under R.C. 503.07, the "annexed township territory continues to be a component part of the township in which it was situated prior to municipal annexation." 1984 Ohio Atty.Gen.Ops. 051, 1984 WL 196643, *3. A prior attorney general opinion, rendered in 1977, had indicated that the procedure in R.C. 503.07 should be followed as a matter of course each time a municipality annexes part of a township, due to possible inequities when residents may find themselves taxed by both the municipality and the township.

{¶ 106} If a municipality fails to take action under R.C. 503.07, the property becomes part of the municipal corporation but also remains part of the township. The taxpayers in the annexed area reside both in the city and in the township and are obligated to pay both taxes levied by the township and taxes levied by the city. 2005 Ohio Atty.Gen.Ops. 024, at 2–244 to 2–245. Of course, these taxes are subject to the ten-mill limit on real property taxation, unless a majority of the voters have authorized additional taxes.

{¶ 107} Centerville concedes in its brief that Ohio law has long allowed municipal corporations to eliminate overlapping jurisdictions within the corporation, by petitioning the board of county commissioners under R.C. 503.07 to remove the territory from the original township and conform its boundaries to those of the municipal corporation. Centerville fails to mention in its brief, however, that Ohio law has also required municipal corporations to pay townships real property tax on the annexed area. Before Senate Bill 5 was enacted in 2001, the payments extended only to situations in which the area in question was 15 percent of more of the taxable value of the township. Senate Bill 5 eliminated this threshold value requirement and now requires payment whenever boundaries are conformed under R.C. 503.07. R.C. 709.19.

C. Changes in Annexation Law after the 2001 Amendments in Senate Bill 5.

{¶ 108} The legislature made a number of changes to R.C. 709.19 when it enacted Senate Bill 5. Prior to the enactment of Senate Bill 5, R.C. 709.19 provided for three schedules of payment that would be made to townships if territory was annexed. But the statute applied only to situations in which the annexed territory included at least 15 percent, but less than 100 percent, of the

total taxable value of real, public utility, and tangible personal property subject to taxation in the township in the base year, which was the calendar year immediately preceding the annexation period. Former R.C. 709.19(B)(1), 1981 Am.H.B. No. 19, 139 Ohio Laws, Part I, 1422. The 15 percent amount also had to occur within a certain period of time, which was a period referred to in the statute as one, two, or three consecutive 12-month periods. Id.

{¶ 109} The schedules of payment depended on which annexation period applied. For example, the schedule allowed for 100 percent of the tax revenues to be paid back to the township for the first three years, if the annexation period was 12 consecutive months. Under this schedule, the payment of taxes to the township extended for seven years. Former R.C. 709.19(B), 1981 Am.H.B. No. 19, 139 Ohio Laws, Part I, 1422, and Legislative Service Commission Final Analysis, Am.Sub.S.B. No. 5, 26–27. The duration of payments decreased if the annexation period was longer.

{¶ 110} The payments were also required to be made whether or not township boundaries were conformed to those of the annexing municipal corporation, because R.C. 503.07 was not mentioned in R.C. 719.09 prior to the 2001 amendments.

{¶ 111} R.C. 709.19 was repealed by Senate Bill 5, and new R.C. 709.19 was enacted. Under the new statute, payments to townships begin upon the exclusion of the annexed property from the township under R.C. 503.07. Thus, the payments are no longer dependent upon at least a 15 percent loss of township tax value. This indicates an intent to benefit townships, by allowing payment whenever any taxable property is excluded from the township.

{¶ 112} The new statute also provides two schedules of payments, divided into categories of commercial and industrial real property versus residential and retail property. The payments are somewhat less at the beginning (80 percent, as opposed to the prior schedule of 100 percent, for the first three years). However, the payments last longer and are larger at the end. For example, the new (and current) version of R.C. 709.19(C) provides that a township will receive 80 percent of the township taxes in the annexed area during years one through three, 65 percent in years four and five, 62.5 percent in years six and seven, 57.5 percent in years eight and nine, and 42.5 percent in years ten through twelve. This applies to "commercial and industrial, real, personal, and public utility property taxes [as] if no annexation had occurred." R.C. 709.19(C)(1)(a) through (e).

{¶ 113} An even more significant change occurred as a result of the addition of the following language to R.C. 709.19(C)(2) in Senate Bill 5. As enacted in Senate Bill 5, R.C. 719.09(C)(2) states:

{¶ 114} "If there has been an exemption by the municipal corporation of commercial and industrial real, personal, or public utility property taxes pursuant to section 725.02, 1728.10, 3735.67, 5709.40, 5709.41, 5709.62, or 5709.88 of the Revised Code, *there shall be no reduction in the payments owed to the township due to that exemption. The municipal corporation shall make payments to the township under division (C)(1) of this section, calculated as if the exemption had not occurred.*" (Emphasis added.)

{¶ 115} The statutes listed in R.C. 709.19(C)(2) include urban renewal development funds (R.C. 725.02), community redevelopment tax exemptions (R.C. 1728.10), exemptions from tax in metropolitan housing reinvestment areas (R.C. 3735.67), tax exemptions for improvements for a public purpose (tax increment financing), and for municipal incentive districts (R.C. 5709.40(B) and (C), respectively), tax exemptions for lands owned by municipalities and leased (R.C. 5709.41), tax exemptions for municipal enterprise zones (R.C. 5709.62), and tax exemptions for incentive agreements for remediation of property (R.C. 5709.88).

{¶ 116} Thus, after the 2001 amendments, a municipality must make the payments even if the municipality has exempted the annexed property from real estate taxes for purposes like community-redevelopment funds, TIF funds, or urban-renewal debt-retirement funds. Again, this shows an intent to benefit townships.

{¶ 117} The TIF exemption that Centerville obligated itself to enact is authorized by one of the sections referred to in R.C. 709.19(C)(2). That section, R.C. 5709.40, permits municipalities to declare improvements to parcels of real property to be for a public purpose. R.C. 5709.40(B). Up to 75 percent of an improvement declared to be for a public purpose may be exempted from real property taxation for up to ten years, without approval of the board of education of the local school district. Longer exemption periods may be granted if the school board approves, or if the municipality agrees to pay the school district the amount of taxes that would have been paid if the improvement had not been exempted from taxation. In that event, the tax exemption can be granted for up to 30 years. R.C. 5709.40(D)(1).

{¶ 118} R.C. 5709.40(A)(4) defines "improvement" as "the increase in the assessed value of any real property that would first appear on the tax list and duplicate of real and public utility property after the effective date of an ordinance adopted" under R.C. 5709.40, were it not for the exemption granted by the ordinance. Accordingly, when a municipality enacts a TIF resolution, the TIF will cover any increases in the value of the property due to development.

{¶ 119} Notably, R.C. 709.19 as enacted by Senate Bill 5 also includes the amount of the taxes on the value of real property, *as improved,* within the

payments that a municipality is required to make to a township when the boundaries are conformed under R.C. 503.07. For example, R.C. 709.19(C)(1) states that "the municipal corporation that annexed the territory shall make the following payments to the township from which the territory was annexed with respect to *commercial and industrial real, personal, and public utility property taxes using the property valuation for the year that the payment is due * * *.*" (Emphasis added.) R.C. 709.19(D) similarly states, "The municipal corporation that annexed the territory shall make the following payments to the township from which the territory was annexed with respect to residential and retail real property taxes *using the property valuation for the year that the payment is due* * * *." (Emphasis added.)

{¶ 120} As the value of commercial, residential, and retail real property increases over time due to improvements to the property, a township would, therefore, be entitled to payments that include the increases in the taxable value of real property, and a municipal corporation cannot exclude these amounts from the payments it is required to make when annexation occurs and the boundaries are conformed to the municipality. Accordingly, under existing law, if Centerville had been permitted to exclude the annexed area from Sugarcreek Township, Centerville would still have been obligated to pay Sugarcreek amounts ranging from 80 percent to 42.5 percent of the township taxes for commercial property in the annexation area, for 12 years. The payments for residential and retail real property taxes would be slightly different, as they range by statute from 80 percent to 27.5 percent, for 12 years. R.C. 709.19(D)(1) through (4).

{¶ 121} Centerville would also have been obligated to pay Sugarcreek based upon the improved value of the annexed property. As noted, R.C. 709.19(C)(2) states that in situations in which a municipality exempts real property from taxation, there shall be no reduction to the township due to the exemption, and the payments shall continue as if the exemption had not been granted. Therefore, if Centerville had excluded the annexed area from Sugarcreek and had exempted improvements in the area from taxation, Centerville would still be obligated to pay Sugarcreek the amount of real property taxes owed on the real property, *including improvements, and without reduction in the amount,* and would have to continue the payments as if the exemption had not been granted.

{¶ 122} While a municipality could argue that this is unfair, we have previously rejected a similar claim. In *Roderer,* 14 Ohio App.3d 155, 14 OBR 172, 470 N.E.2d 183, a municipality contended that R.C. 709.19 impermissibly intruded upon its home-rule powers. We disagreed, noting:

{¶ 123} "The enactment of the annexation ordinances was voluntary, and was accomplished with full knowledge that any tax monies received from the annexed territory might be subject to a future sharing requirement with the township

from which the territory was being annexed. Moraine concedes that the legislature could have constitutionally enacted a statute which made a redistribution of tax revenues a condition precedent to annexation. We see no distinction in making such redistribution a condition subsequent if the fifteen percent threshold is reached. If any of these municipalities was unwilling to assume the burden of the known potential condition subsequent, the same could have been avoided by failing to enact the annexation ordinance." Id. at 157, 14 OBR 172, 470 N.E.2d 183.[5]

{¶ 124} By indicating that a municipal corporation must pay the real property taxes to the township when it excludes the property from the township and conforms boundaries under R.C. 503.07, the legislature is applying the same reasoning that we did in *Roderer*. The effect of the annexation statutes after Senate Bill 5 is that if a city annexes the property of a township and then excludes the property from the township under R.C. 507.03, the city must still pay the township the property taxes, even on improvements, and cannot reduce the payments. In view of these facts, what should logically occur if a municipal corporation annexes property in a township pursuant to a type–2 annexation procedure, thereby leaving the property in the township?

### D. The Effect of Annexation in a Type–2 Annexation, or Other Special Procedure under Senate Bill 5, in which the Property Remains in the Township.

{¶ 125} Again, annexation is governed by R.C. Chapter 709. After an annexation is approved by the board of county commissioners and is accepted by a municipality, the annexed territory is a part of the municipality, and the inhabitants have the rights and privileges of inhabitants, and are subject to the power, of the municipality. R.C. 709.10. However, if the municipality does not conform the township boundaries under R.C. 503.07, the inhabitants are also residents of the township, with voting rights. The residents are also subject to taxation in both the municipal corporation and in the township. 2005 Ohio Atty.Gen.Ops. 024, 9–10.

{¶ 126} The legislature enacted Senate Bill 5 in 2001 and substantially altered existing annexation statutes. Under prior law, there were no special procedures that could be applied where 100 percent of the property owners consented to an annexation. The statutes provided that a majority of owners of adjacent real

---

**5.** At the time of our decision in 1983, tax-sharing payments under R.C. 709.19 were subject to a threshold requirement that 15 percent of the total taxable value of property subject to taxation in the township be reached, either by the annexation at issue or by the sum total of annexations by other municipalities. 14 Ohio App.3d at 157, 14 OBR 172, 470 N.E.2d 183. As we noted, this provision has since been eliminated, and there is no threshold limit.

estate could petition the board of county commissioners to be annexed and a public hearing had to be held, after which the board could grant the petition if, among other things, the annexed area was not unreasonably large. This gave the board discretion over the annexation. *In re Annexation of 118.7 Acres in Miami Twp.* (1990), 52 Ohio St.3d at 131–132, 556 N.E.2d 1140. The special procedures, however, eliminate discretion by requiring the commissioners to approve annexation if the petition complies with certain technical requirements. *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Commrs.*, 112 Ohio St.3d 262, 2006-Ohio-6411, 858 N.E.2d 1193, at ¶ 10, fn. 3, and *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Commrs.*, Montgomery App. No. 22664, 2008-Ohio-6542, 2008 WL 5196445, at ¶ 25.

{¶ 127} Expedited type-2 annexations are governed by R.C. 709.023, which states:

{¶ 128} "(A) A petition filed under section 709.021 of the Revised Code that requests to follow this section is for the special procedure of annexing land into a municipal corporation when, subject to division (H) of this section, the land also is not to be excluded from the township under section 503.07 of the Revised Code. The owners who sign this petition by their signature expressly waive their right to appeal in law or equity from the board of county commissioners' entry of any resolution under this section, waive any rights they may have to sue on any issue relating to a municipal corporation requiring a buffer as provided in this section, and waive any rights to seek a variance that would relieve or exempt them from that buffer requirement."

{¶ 129} R.C. 709.023(B) requires notice to be given to various entities, including the fiscal officer of each township that has territory included within the proposed annexation area. The municipal corporation to which the area is to be annexed is required to adopt an ordinance indicating what services will be provided to the area upon annexation. R.C. 709.023(C). However, the statute does not require specific services to be provided. The municipality is also required to provide a buffer separating the annexed territory from adjacent land in the township if the municipal zoning is incompatible with uses permitted by township zoning. Id.

{¶ 130} The township is permitted to object to the annexation petition, but its objection is limited solely to the petition's failure to meet the conditions specified in R.C. 709.023(E). These conditions relate to items like whether the borders of the annexed area and municipality are contiguous, and whether the persons who signed the petition are the owners of the real estate located in the proposed annexation area. R.C. 709.023(D). Failure to timely file an ordinance or resolution objecting to the annexation constitutes consent to the annexation. Id. If objections are filed, the board of commissioners reviews the petition to decide whether the petition meets the requirements of R.C. 709.023(E). If the petition

meets the requirements, the board must enter upon its journal a resolution granting the annexation. There is no appeal from the grant or denial of the resolution, but any party may seek a writ of mandamus to compel the board to perform its duties. R.C. 709.023(F) and (G).[6]

{¶ 131} R.C. 709.023(H) provides:

{¶ 132} "Notwithstanding anything to the contrary in section 503.07 of the Revised Code, unless otherwise provided in an annexation agreement entered into pursuant to section 709.192 of the Revised Code or in a cooperative economic development agreement entered into pursuant to section 701.07 of the Revised Code, territory annexed into a municipal corporation pursuant to this section shall not at any time be excluded from the township under section 503.07 of the Revised Code and, thus, remains subject to the township's real property taxes."

{¶ 133} Sugarcreek contends that R.C. 709.023(H) unambiguously authorizes it to collect all taxes due from real property in the annexation area, without restriction. Centerville contends that R.C. 709.023(H) is unambiguous and merely reflects that a municipality may not conform township boundaries after annexation is approved. Alternatively, Centerville contends that if R.C. 709.023(H) is ambiguous, it must be reconciled with existing authority, which allows municipalities to enact TIFs following annexation.

{¶ 134} R.C. 709.023(H) is not quite as narrow as Centerville contends. R.C. 709.023(H) does not merely indicate that boundaries may not be conformed; it also clearly states that the annexed property "remains subject to the township's real property taxes."

{¶ 135} That phrase is used in R.C. 709.023(H) in declaring, "Notwithstanding anything to the contrary in section 503.07 of the Revised Code, * * * territory annexed into a municipal corporation pursuant to this section *shall not at any time be excluded from the township under section 503.07 of the Revised Code and, thus, remains subject to the township's real property taxes.*" (Emphasis

---

6. We have previously held that townships are not "parties" under R.C. 709.023(F) and (G) for purposes of filing mandamus actions to compel the commissioners to perform their duties. *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Commrs.*, Montgomery App. No. 22664, 2008-Ohio-6542, 2008 WL 5196445, at ¶ 27. We also concluded in *Butler Twp. Bd. of Trustees* that a township lacks standing to file a declaratory-judgment action contesting an expedited type–2 annexation. Id. at ¶ 29. The Supreme Court of Ohio has accepted an appeal in that case, and the appeal is currently pending. *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Commrs.*, 121 Ohio St.3d 1449, 2009-Ohio-1820, 904 N.E.2d 900. *State ex rel. Butler Twp. Bd. of Trustees* is not relevant to the case before us, since Sugarcreek did not appeal the dismissal of its challenge to the annexation petitions. Furthermore, one of our primary reasons for rejecting the township's appeal rights in *Butler Twp. Bd. of Trustees* is that "in * * * type II * * * [annexation] proceedings, the land annexed is not withdrawn from the township, and the township *suffers no economic detriment by the approval of the annexation.*" (Emphasis added.) 2008-Ohio-6542, at ¶ 26.

added.) Our interpretation of this phrase is that the words "and, thus, remains subject to the township's real property taxes" are simply intended to reflect the law prior to Senate Bill 5.

{¶ 136} Under R.C. 709.023(H), the territory remains in the township, as in situations in which a municipality has annexed township property but has failed to exclude the property from township borders under R.C. 503.07. Under existing interpretations of the Ohio attorney general and Ohio case law, residents of the annexed territory would be residents of both the township and municipality, would be entitled to vote in both city and township elections, and would be subject to taxation by both taxing authorities. E.g., 2005 Ohio Atty.Gen.Ops. 2005-024, at 2–244 to 2–245 (discussing situations where township property is annexed and the city has not asked the commissioners under R.C. 503.07 to conform the township boundaries to those of the city). Therefore, under the law in effect prior to Senate Bill 5, the annexed property would still have been subject to township taxation if it remained in the township.

{¶ 137} The Legislative Service Commission's Final Analysis of Senate Bill 5 does not discuss R.C. 709.023(H) in any detail. The Final Analysis simply states:

{¶ 138} "Notwithstanding anything to the contrary in the provision of continuing law pertaining to the conforming of township boundaries * * *, unless otherwise provided in the annexation agreement or in a cooperative economic development agreement, territory annexed into a municipal corporation pursuant to this special procedure must not at any time be excluded from the township, and remains subject to the township's real property taxes (sec.709.023(H))." Id. at 18.

{¶ 139} Admittedly, R.C. 709.023(H) does not say that the property is also subject to municipal tax, but under existing law, that would not be necessary, since each parcel of land in Ohio is subject to taxation by every taxing unit within which it is located. R.C. 5705.01(A) and (H); R.C. 5705.93; and 2005 Ohio Atty.Gen.Ops. 2005–043, 2–449 to 2–450.

{¶ 140} Because R.C. 709.023(H) fails to state that the annexed property is not subject to municipal taxes, it does not appear to have been intended to alter existing law. Had the legislature intended to remove a municipality's existing ability to tax real property located within its borders, the legislature would have said so. This does not mean, however, that Sugarcreek is restricted to taxing only the unimproved value of the property, nor does it mean that Centerville can enact a TIF or other tax-abatement ordinance that interferes with Sugarcreek's collection of property tax revenue on the unimproved and improved portions of the annexed property.

{¶ 141} Under the law before and after the enactment of Senate Bill 5, revenues from real property taxation must be shared by the jurisdictions that have taxing authority over the property.

{¶ 142} As noted, Ohio law allows up to ten mills of property tax to be levied without voter approval. This millage, which is called "inside millage," is allocated among various taxing authorities. 2005 Ohio Atty.Gen.Ops. 2005–043, 2–463. Therefore, even before annexation, Sugarcreek would not have been entitled to the total amount of the inside millage on the property within the township if other taxing authorities also had the ability to levy taxes. For example, local school districts are taxing authorities under R.C. 5705.01(A) and receive money from the unvoted or inside millage within their district. See, *e.g., Strongsville City School Dist. Bd. of Edn. v. Lorain Cty. Budget Comm.* (1988), 38 Ohio St.3d 50, 526 N.E.2d 297 (discussing dispute between school district and township over allocation of inside millage obtained from taxation of property located in the township).

{¶ 143} Furthermore, reduction of taxes obtained from levies may be required in situations involving overlapping political subdivisions. R.C. 5705.31 provides for "minimum levies within the 10-mill limitation for the current expense and debt service of each subdivision or taxing unit, based on the average inside millage levies in effect during the last five years before the 10–mill limitation went into effect (that is, during the years 1929 through 1933). * * * Certain levies are given priority, and specific provisions govern the minimum levy for a school district." 2005 Ohio Atty.Gen.Ops. No. 2005–043, at 2–463 to 2–464.

{¶ 144} Because of these competing interests, tax levies paid to cities and townships that overlapped could have been reduced under R.C. 5705.31 prior to the enactment of Senate Bill 5 in 2001.

{¶ 145} "The general rule prior to [the effective date of Senate Bill 5] * * *, was that the allocation of the inside millage was made in accordance with R.C. 5705.31 in the territory having the most taxing units eligible to share in that millage, and (subject to express statutory exceptions) the rate so determined for each taxing unit was then levied uniformly throughout that taxing unit, in accordance with the requirement of Ohio Const. art. XII, § 2 that land and improvements be taxed 'by uniform rule.' As was stated in 1993 Op. Att'y Gen. No. 93–019:

{¶ 146} " 'It is evident that, because of the financial needs of various taxing units, the amount of inside millage sought may exceed the amount of inside millage available. The county budget commission is given statutory responsibility for approving tax levies and for fixing the amounts that various taxing units may levy within the ten-mill limitation. Certain levies are required to be

approved, and some taxing units are guaranteed minimum levies within the ten-mill limitation. The county budget commission must, however, also make adjustments and reductions, as appropriate, in order to comply with the ten-mill limitation on unvoted taxes. See R.C. 5705.31–.32, .34; 1979 Op. Att'y Gen. No. 79–063; 1956 Op. Att'y Gen. No. 7421, p. 813. Reduction of various levies may be necessary in the case of overlapping political subdivisions to assure that the ten-mill limitation is given effect throughout the state. See, *e.g., Cambridge City School District v. Guernsey County Budget Commission*, 11 Ohio App.2d 77, 40 O.O.2d 239, 228 N.E.2d 874 (Guernsey County 1967), aff'd, 13 Ohio St.2d 77, 42 O.O.2d 226, 234 N.E.2d 512 (1968); Op. No. 79–063; 1956 Op. No. 7421.' " 2005 Ohio Atty.Gen.Ops. 2005–043, 2–464.

{¶ 147} Unfortunately, because of the requirement of uniform taxation within districts, if the inside millage in part of a township or municipality had to be reduced because it overlapped another political subdivision, the millage in the entire township or municipality had to be correspondingly reduced. 2005 Ohio Atty.Gen.Ops. 2005–043 at 2–465 to 2–466. Therefore, there might be parts of the township and municipality where the entire ten-mill limit could not be levied. In order to address this issue, the General Assembly enacted R.C. 5705.315 in 2001, as part of Senate Bill 5. R.C. 5705.315 states:

{¶ 148} "With respect to annexations granted on or after the effective date of this section and during any tax year or years within which any territory annexed to a municipal corporation is part of a township, the minimum levy for the municipal corporation and township under section 5705.31 of the Revised Code shall not be diminished, except that in the annexed territory and only during those tax year or years, and in order to preserve the minimum levies of overlapping subdivisions under section 5705.31 of the Revised Code so that the full amount of taxes within the ten-mill limitation may be levied to the extent possible, the minimum levy of the municipal corporation or township shall be the lowest of the following amounts:

{¶ 149} "(A) An amount that when added to the minimum levies of the other overlapping subdivisions equals ten mills;

{¶ 150} "(B) An amount equal to the minimum levy of the municipal corporation or township, provided the total minimum levy does not exceed ten mills.

{¶ 151} "The municipal corporation and the township may enter into an agreement to determine the municipal corporation's and the township's minimum levy under this section. If it cannot be determined what minimum levy is available to each and no agreement has been entered into by the municipal corporation and township, the municipal corporation and township shall each receive one-half of the millage available for use within the portion of the territory annexed to the municipal corporation that remains part of the township."

{¶ 152} The Ohio attorney general has interpreted this provision as follows: "[W]ith respect to any annexation granted on or after October 26, 2001, during any tax year within which territory annexed to a municipality is part of a township, both the municipality and township retain the minimum levies calculated pursuant to R.C. 5705.31, except in the territory in which the subdivisions overlap. In that territory, the minimum levies are reduced as prescribed, in order to come within the 10-mill limitation. The municipality and township may enter into an agreement regarding their respective minimums within the 10-mill limitation. If there is no agreement, the municipality and township 'shall each receive one-half of the millage available for use within the portion of the territory annexed to the municipal corporation that remains part of the township.' R.C. 5705.315." 2005 Ohio Atty.Gen.Ops. 2005–043, at 2–466 to 2–467.

{¶ 153} If the municipal corporation and the township enter into an annexation agreement to reallocate their shares of the minimum levies, the county auditor is required to allocate, to the extent possible, the minimum levy according to their agreement. R.C. 3705.31(D).

{¶ 154} Notably, R.C. 5705.31 and 5705.315 do not provide that the township is entitled to no more than its share of the levies on the taxable value of the real property prior to improvement. Furthermore, the attorney general's interpretation is consistent with the Final Analysis for Senate Bill 5, which contains the following discussion:

{¶ 155} "Division of inside millage in annexed territory

{¶ 156} "The act contains special provisions related to the allocation in the annual tax budget process of the minimum levies within the ten-mill limitation for the current expense and debt service of an annexing municipal corporation and a township whose territory is annexed. These special provisions apply only (1) in the annexed territory, (2) for those tax years in which annexed territory remains part of a township after annexation, and (3) for annexations that are granted on or after the act's effective date. (Sec.5705.315.)

{¶ 157} "Under these circumstances, the minimum levy under the Tax Levy Law as pertains to the annexed territory is an amount that, when added to the minimum levies of the other overlapping subdivisions, equals ten mills or, if the amount would be lower, an amount equal to the minimum levy of the municipal corporation or township. * * * This formula is stated to be for the purpose of preserving the minimum levies of overlapping subdivisions so that the full amount of taxes within the 10–mill limitation may be levied to the extent possible. (Sec.5705.315.)

{¶ 158} "Once determined, the minimum levy amount pertaining to the annexed territory then must be divided between the municipal corporation and the township. The amount to go to each is to be determined either by an agreement

between them or, if no agreement can be reached and the amount to go to each cannot be determined otherwise, by dividing the available millage determined for the annexed territory so that the municipal corporation and the township each receive one-half. (Sec.5705.315.)" (Footnotes omitted.) Legislative Service Commission Final Analysis, Am.Sub.S.B. 5, 34.

{¶ 159} The annexation laws thus provide compensation for townships in two different situations. Where a municipality annexes land and conforms the boundaries under R.C. 503.07, the municipality is required to pay the township gradually decreasing proportions of the property tax revenues for 12 years. Where land is annexed using the expedited type–2 annexation procedure, the land is not excluded from the township and remains subject to township real property taxation. In the latter event, the township and annexing municipality share the real property tax revenues on the inside millage.

E. The Effect of the Statutes Pertaining to Municipal
and Township Tax–Increment Financing

(1) Municipal Tax–Increment Financing

{¶ 160} R.C. 5709.40(B) allows municipalities to declare improvements to certain parcels of real property to be a "public purpose" and to exempt not more than 75 percent of the improvement from taxation for up to ten years. The percentage may exceed more than 75 percent, for a period up to 30 years, if the ordinance declaring the improvements to be a public purpose also states that the local school district shall be paid the amount of taxes that would have been paid if the parcel had not been exempted from taxation. R.C. 5709.40(D)(1). The school district can also consent to the increased time period and amount of exempted assets. R.C. 5709.40(D)(2). Even where the relevant period is only ten years, the school district must still be notified. R.C. 5709.83(A).

{¶ 161} Under R.C. 5709.42(A), the municipal corporation may require owners of any structure located on the parcel to make annual service payments in lieu of taxes. These payments are collected and distributed at the same time and in the same manner as real property tax payments. The municipal corporation must also establish a public-improvement tax-increment fund into which the service payments are deposited. R.C. 5709.43(A).

{¶ 162} Under R.C. 5709.40(A)(4), "improvement" is defined as:

{¶ 163} "The increase in the assessed value of any real property that would first appear on the tax list and duplicate of real and public utility property after the effective date of an ordinance adopted under this section were it not for the exemption granted by that ordinance."

{¶ 164} Thus, under the municipal TIF statute, Centerville could enact a TIF resolution for the annexed property and exempt up to 75 percent of the assessed

value of improvements on the property from real property taxation, for ten years. If Centerville obtained the approval of the local school districts, or agreed to pay the districts the amount of property tax they would have received anyway, Centerville could exempt up to 100 percent of the assessed value for up to 30 years.  In either situation, this would deprive Sugarcreek of its statutory share of the inside millage on the property.  Although Sugarcreek would still receive its proportionate share of the inside millage on the unimproved portions of the annexed real property, it would not receive any share of the tax revenue from the improvements to the property.

### (2) Township Tax–Increment Financing

{¶ 165} Like municipalities, townships are also permitted to designate TIF districts in public-improvement areas and to exempt real property in the area from taxation, contingent upon the property owners' service payments in lieu of tax.  R.C. 5709.73.  The provisions for township TIFs are similar to those for municipalities, including the fact that school districts must approve the exemption of percentages of improvements that exceed 75 percent.  R.C. 5709.73(B) and (D).

{¶ 166} R.C. 5709.73(B) provides:

{¶ 167} "A board of township trustees may, by unanimous vote, adopt a resolution that declares to be a public purpose any public infrastructure improvements made that are necessary for the development of certain parcels of land located in the unincorporated area of the township.  Except with the approval under division (D) of this section of the board of education of each city, local, or exempted village school district within which the improvements are located, the resolution may exempt from real property taxation not more than seventy-five per cent of further improvements to a parcel of land that directly benefits from the public infrastructure improvements, for a period of not more than ten years. The resolution shall specify the percentage of the further improvements to be exempted and the life of the exemption."

{¶ 168} "Further improvements" is defined as "the increase in the assessed value of real property that would first appear on the tax list and duplicate of real and public utility property after the effective date of a resolution adopted under this section were it not for the exemption granted by that resolution.  For purposes of division (B) of this section, 'improvements' do not include any property used or to be used for residential purposes."

{¶ 169} Thus, a township is permitted to create its own TIF district and the improvements that can be exempted include increases in the assessed value of real property after the date of the resolution creating the TIF. The TIF statutes, therefore, anticipate that the township is entitled to revenues from the increased value of the improved property.

{¶ 170} Sugarcreek enacted a TIF resolution in April 2006. Consistent with R.C. 5709.73, the resolution created a TIF district that encompasses some of the annexed area and exempts 75 percent of the assessed value of improvements in the area from real property taxation for a period of ten years. The property owners are to make semiannual service payments in lieu of taxes, which will be deposited in a tax-increment-equivalent fund and will be used to pay the cost of the public improvements in the TIF district. Sugarcreek Township Resolution No. 2006–04–20–01.

### F. How to Reconcile All the Statutes Involved in This Case.

{¶ 171} The only way to reconcile all the statutes in this case is to conclude that Sugarcreek and Centerville are both entitled to tax the real property in the annexation area, since the real property is within each of their respective borders. The residents in the annexation area are considered residents of both areas and are entitled to all the rights associated with residency, including voting privileges.

{¶ 172} Both Centerville and Sugarcreek are entitled to retain their minimum levies on the real property in the annexation area, calculated pursuant to R.C. 5705.31. However, their minimum levies must be reduced in the manner prescribed, to come within the ten-mill limit on inside millage. Sugarcreek and Centerville may enter into an agreement regarding their respective minimums within the ten-mill limit, but if there is no agreement, and it cannot be decided what minimum levy is available to each, Sugarcreek and Centerville shall each receive one-half of the inside millage available for use within the portion of the territory annexed to Centerville that remains within Sugarcreek Township. R.C. 3705.315(B).

{¶ 173} If Sugarcreek and Centerville enter into an annexation agreement to reallocate their shares of the minimum levies, the county auditor must allocate, to the extent possible, the minimum levy according to their agreement. R.C. 3705.31(D).

{¶ 174} Both Sugarcreek and Centerville may enact TIF resolutions that exempt improvements on real property within the annexation area, including the assessed value of improvements to the real property, from real property taxation. However, Sugarcreek and Centerville may not enact TIF resolutions that interfere with each other's share of the minimum levies on the real property within the annexation area.[7]

{¶ 175} In view of the preceding discussion, the trial court erred in concluding that Centerville could never pass TIF legislation that would divert any of the

---

7.  {¶ a} Centerville has not questioned the validity of Sugarcreek's TIF, which was enacted before the property was annexed. However, the conclusion appears inescapable that neither

property taxes from Sugarcreek. The court was correct in concluding that Centerville cannot interfere with Sugarcreek's collection of its share of the minimum levies on the unimproved and improved value of the real estate that still remains in the township. Since Sugarcreek has already enacted a TIF plan that exempts 75 percent of the improvements on some of the annexation property, Centerville's proposed TIF, exempting 75 percent of the property from taxation, would violate R.C. 709.023(H).

{¶ 176} However, the trial court failed to recognize that Centerville is also entitled to its share of the minimum levies on the property under R.C. 5709.31 and 5709.315 and can therefore enact TIF legislation to the extent that it does not interfere with Sugarcreek's right to collect its share of the minimum levies on the property.

{¶ 177} Accordingly, Centerville's third assignment of error is sustained in part and overruled in part. This cause is remanded to the trial court for further proceedings consistent with this opinion.

V

{¶ 178} Centerville's first and second assignments of error having been overruled, and the third assignment of error having been sustained in part and overruled in part, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

GRADY and FROELICH, JJ., concur.

---

Sugarcreek nor Centerville can validly enact a TIF that interferes with the other entity's minimum levy under R.C. 5709.31 and 5709.315. This could be an alternative basis for finding standing, because Sugarcreek has already enacted the TIF. However, Centerville did not raise this as a counterclaim, nor did it ask the trial court to declare Sugarcreek's TIF invalid. Sugarcreek did raise as an issue below that Centerville was not entitled to impose a TIF plan on territory that is already part a TIF district created by Sugarcreek. However, the magistrate indicated that he did not need to address this issue, in view of his conclusion that Sugarcreek was entitled to all the property tax and that Centerville was not entitled to impose a TIF that would divert any part of the tax.

{¶ b} Notably, R.C. 5709.73(B) refers to a township's ability to enact TIFs for development of parcels in the "unincorporated area of the township." This would seem to restrict Sugarcreek's ability to enact further TIFs in the annexation area, because even though the property remains in the township pursuant to R.C. 709.023(H), the property might not be considered to be in an unincorporated area of the township after annexation. Thus, when Sugarcreek's TIF expires in ten years, Sugarcreek may not be able to enact a further TIF plan, assuming the laws remain the same. This may be why Sugarcreek passed the TIF resolution before the land was annexed. However, whether this is the appropriate interpretation of the statute is currently unclear, and there is no explanation in the legislative history of Senate Bill 5.